## ALLEN et ux. v. SYLVANIA CORPORATION.

### Civ. 174.

District Court, W. D. New York.
March 13, 1940.

Lauriston Walsh, of Corning, N. Y., for plaintiffs.

Annabel & Wightman, of Bath, N. Y., (W. Pitt Gifford, of Erie, Pa., of counsel), for defendant.

BURKE, District Judge.

On June 22, 1934, the plaintiffs signed an oil and gas lease covering the farm where they lived in the town of Woodhull, Steuben County, New York. The lease gave the defendant the right to drill for oil and gas. It provided an annual rental of $1 an acre, a one-eighth royalty on all oil produced and $500 for each producing gas well. The lease was prepared by one Engstrom, defendant's representative, in the presence of the plaintiffs and was signed by the plaintiffs at the Allen farmhouse. Two copies were taken by Engstrom and one copy was left with the plaintiffs. Consideration of $1 was paid by Engstrom. Since that time the defendant has paid the land rentals provided in the lease in the total amount of about $700, all of which payments have been retained by the plain-

tiffs. No attempt or offer to return any part has been made. The defendants began to drill a well in October, 1937. It came in as a producing well on February 3, 1938. No attempt was made to repudiate the lease until after the completion of the well. The defendants have offered to pay the rentals accruing under the terms of the lease since the well came in but plaintiffs have refused to accept them. They sue here to set aside the lease on the ground that it was procured by fraud, and ask an accounting for the value of gas taken from the property. On the trial it developed that the title of the farm was in Jennie Allen. Whereupon defendant's motion to dismiss the complaint of John Allen was granted.

The claim of fraud is that Engstrom represented to the plaintiffs that he, in leasing the farm, was giving them one-eighth of any gas produced. It is further claimed that the signed lease was delivered to Engstrom on the condition that he would leave the same with one Frank Parks, who was a notary public in the Village of Woodhull, and in whom the plaintiffs had confidence, in order that he might subsequently read it over to them before they became bound by it. Concededly, the lease was never taken to Parks but was delivered to an officer of the defendant and signed by the defendant. The defendant denies that such representations were made, denies the conditional delivery and asserts the defense of laches and equitable estoppel on the ground that plaintiffs did not promptly disavow the lease on the discovery of the alleged fraud but allowed the defendant to proceed with and complete drilling operations.

■ In my opinion the testimony does not sustain the charge of fraud. The plaintiffs base the charge of fraud upon their own testimony and that of a son and daughter who were present when the lease was signed. All of these witnesses testified that Engstrom said that he was "giving an eighth", that he drew the lease on his own typewriter in the Allen farmhouse, and that he did not read the lease to the Allens nor did any of the Allen family read it. As far as the plaintiffs' testimony goes it does not appear that either of the plaintiffs knew the provisions of the lease, and particularly that part of the lease which dealt with what they were to receive in case gas was produced in

paying quantities, until several years later and this in spite of the fact that they had a copy of the lease from the day it was signed by them. Even accepting the testimony as true that neither of the plaintiffs were able to read, we cannot lose sight of the fact that the son and daughter were present when the lease was signed and both exhibited some interest at that time in the royalty provision. The daughter was at least twenty years old and had just graduated from high school. The son was able to read. In the face of this I cannot accept the testimony of the plaintiffs that they did not know the terms of the lease until several years afterwards.

■ The evidence does not establish that the delivery of the lease to Engstrom was conditional. The testimony on the part of the plaintiffs was that after Allen had signed the lease he left the house with his son to go to another part of the farm and that the arrangement then was that Engstrom was to take the lease to Parks so that he could subsequently read it over to him. Jennie Allen and her daughter both testified, however, that Engstrom told them before he left the house that he did not intend to take the lease to Parks. Even though Engstrom may have told Allen before he left that he would take the lease to Parks, Allen subsequently knew that he had no intention of doing so. He testified that he never at any time went to see Parks about it. Plaintiffs accepted the benefits accruing to them under the lease until a producing well came in on the property almost four years later.

■ Even if we assume that the lease was procured by fraud there came a time when the plaintiffs knew that the lease did not provide a one-eighth royalty on gas. According to Allen's story, Rogers and Bryson, independent dealers, came to see him about purchasing his rights in the lease. He knew then that it did not provide an eighth for gas. He said he did not know whether that occasion was before or after the well came in. But he had talked to Engstrom, according to his own story, in the fall of 1937 about getting the lease changed. Engstrom said it was in the latter part of September, 1937. Even then Allen did not claim that they had signed the lease through misrepresentation or fraud. Thereafter defendant was allowed to proceed with drilling operations without any objection or assertion of a

98

claim of fraud by the plaintiffs. After the producing well came in and on March 31, 1938, Allen went to defendant's office in Oil City, Pa. He returned the check which the defendant had previously sent to Jennie Allen for $500 and asked to have the lease modified to provide one-eighth royalty for gas. Even then he did not claim any fraud in procuring the lease. The claim was that originally they had the option to choose between the flat rate of $500 per producing gas well or one-eighth royalty and that they had the right to change it to one-eighth. He said the purpose of his visit was to have the change made.

Such a course of conduct upon the part of the plaintiffs amounts to laches and equitable estoppel. It was the duty of the plaintiffs, when they discovered what they claimed to be fraud, to promptly disavow the lease if they elected to rescind. They could not sit by and allow the defendants to expend money in drilling operations awaiting the result of the same to determine their course. Having done so, they are estopped from rescission of the lease. Brite et al. v. W. J. Howey et al., 5 Cir., 81 F.2d 840.

It has been claimed here that the plaintiff Jennie Allen is not bound by any conduct on the part of her husband John Allen nor estopped by any knowledge that he had. The evidence fairly establishes that John Allen was at all times acting as the authorized agent for Jennie Allen. In the very beginning and on the occasion when the lease was made Jennie Allen told Engstrom that he would have to take up the matter of leasing with her husband. Throughout the whole matter John Allen appears to have been the one who took the active part. The circumstances show that this was with the full consent of Jennie Allen. They considered themselves equally interested. The lease was signed by both husband and wife. This action was brought by both husband and wife. It was only when it developed on the trial that the deed to the farm stood in the name of Jennie Allen that the complaint of John Allen was dismissed. Knowledge on the part of Allen as to any matter affecting the lease was equivalent to knowledge on the part of his wife.

The complaint is dismissed. The defendant may submit findings, conclusions and a decree and settle the same on five days' notice.